UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

PLYMOUTH GRAIN TERMINALS, LLC, a Delaware limited liability company, CENTRAL WASHINGTON CORN PROCESSORS, INC.  a Washington corporation, and PAULSON COMMODITIES, LTD., an Oregon corporation,

     Plaintiff,

  v.

LANSING GRAIN COMPANY, LLC, a Michigan limited liability company, LANSING GRAIN COMPANY, an assumed name, LGC GRAIN COMPANY, LLC, a Michigan limited liability company, and LANSING TRADE GROUP, LLC, a Delaware limited liability company,

     Defendant.

NO:  10-CV-5019-TOR

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 1

_____

LANSING TRADE GROUP, LLC, a
Delaware limited liability company,

        Counterclaim Plaintiff,

    v.

PLYMOUTH GRAIN TERMINALS,
LLC, a Delaware limited liability
company, CENTRAL
WASHINGTON CORN
PROCESSORS, INC., a Washington
corporation, and PAULSON
COMMODITIES, LTD., an Oregon
corporation,

        Counterclaim Defendants.

---

    BEFORE THE COURT are Defendant's Motion for Summary Judgment

(ECF No. 298) and Plaintiff's Amended Motion for Summary Judgment (ECF No.

340).   This matter was heard with oral argument on December 5, 2013.   Joan

Schulkers and John S. Ziobro appeared on behalf of the Plaintiffs.  Kirk T. May

and J. Chad Mitchell appeared on behalf of Defendants. The Court has reviewed

the briefing and the record and files herein, and is fully informed.

//

//

//

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY
JUDGMENT ~ 2

## BACKGROUND

This case concerns a corn marketing agreement and the resulting relationship formed between Plaintiffs Plymouth Grain Terminal, LLC, Paulson Commodities, Ltd., and Central Washington Corn Processors, Inc., and Defendant Lansing Grain Company, LLC. Plaintiffs sued Defendant, alleging breach of contract, breach of fiduciary duty, breach of covenant of good faith and fair dealing, unjust enrichment, interference with prospective advantage, misappropriation of a trade secret, and demanded an accounting. Lansing counterclaimed for breach of contract, breach of covenant of good faith and fair dealing, interference with prospective advantage, tortious interference with contract, and breach of partnership/joint venture (pleading in the alternative). Before the Court are the parties' motions for summary judgment.

## FACTS

Plaintiff Plymouth Grain Terminals, LLC ("PGT") is a Delaware limited liability company with an Oregon principal place of business. ECF No. 304 at 2. It is owned by Dennis Kyllo ("Kyllo"), Steve Paulson ("Paulson"), and Plaintiff Central Washington Corn Processors, Inc. ("CWCP"). CWCP owns 98 percent of PGT. *Id.* Plaintiff CWCP is a Washington corporation with a principal place of business in Washington. *Id.* It is in the business of processing corn and feed ingredients (grinding and milling) for end users such as cattle farms and dairies.

*Id.* CWCP is owned equally by Paulson, Kyllo, and Tom Walters. *Id.* Plaintiff Paulson Commodities, Ltd. ("PC")[1] is an Oregon corporation with a principal place of business in Oregon which brokers grain between buyers and sellers. *Id.* at 3; ECF No. 299 at 3. It is owned solely by Paulson, a broker with the Chicago Board of Trade. ECF No. 304 at 2. AgriNorthwest is an elevator facility in Plymouth, Washington, owned by the Mormon church. *Id.* CWCP built and operated a corn grinder at AgriNorthwest's Plymouth facility. ECF No. 299 at 2.

In March 2003, CWCP and AgriNorthwest entered into a lease agreement under which CWCP leased from AgriNorthwest land at the facility in Plymouth, Washington, to grind corn. ECF No. 299 at 6 (Defendant's Statement of Facts). The lease, as amended in 2005, extended through the end of 2010. *Id.* In July 2009, AgriNorthwest informed CWCP that it was not going to extend the lease beyond 2010. *Id.* The parties could not agree on lease terms for an extension. *Id.* at 7. The parties disagree about why this was so. Plaintiffs contended that it was because AgriNorthwest was aware of Plaintiffs' problems with Lansing; Defendant contends that it was for unrelated business reasons.

---

[1] Not to be confused with Commodities Plus ("CP"), a company owned by Kyllo, but not a party to this lawsuit.

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 4

In or around May or June 2003, Defendant Lansing Grain Company, LLC ("Lansing"), and Plymouth Grain Terminals ("PGT") entered into the Corn Marketing Agreement ("CMA").[2] The CMA was amended in October 2003. The amended CMA provides in part:

> Lansing Grain Company LLC (Lansing) and TI 48-130-6798 (SG) agree to enter into a relationship to market corn from facility at Plymouth, Washington. It is intended that the activity resulting from this agreement will result in a relationship that will generate net operating profits to be split with 60% going to Lansing and 40% going to SG after the first $75,000 is designated to Lansing.
>
> Whereas, SG intends to provide destination marketing, truck logistics coordination, receivable collections services to dairies and feedlots in the area around Plymouth.
>
> Whereas, Lansing intends provide BN shuttle transfer, corn merchandising expertise and management, accounting and credit services, and operating capital.

ECF No. 150-1. There is no written agreement between Lansing and CWCP regarding the grinding services that CWCP provided.  ECF No. 299 at 2.

Generally, the parties dispute what happened during the course of the relationship. Plaintiffs' complaint alleges that CWCP agreed as part of the

---

[2] The parties dispute whether PC and CWPA are also parties to the CMA, but at minimum there appears to be no dispute that PGT is a party. ECF No. 12-1; ECF No. 12-2 (the CMA is between Lansing and "TI 48-130-6798 (SG)"); ECF No. 1 at 2 (PGT is also known as TI 48-130-6798, its tax identification number).

agreement between PGT and Lansing to finance and build a corn grinder at the AgriNorthwest facility and actually paid approximately $1.2 million to build the grinder. ECF No. 1 at 4. Plaintiffs' complaint also alleges that PC was brokering the corn between buyers and Lansing. ECF No. 1 at 4.

During the course of the parties' relationship under the CMA, representatives of Lansing had access to PC's customer lists and customer information. *See* ECF No. 299 at 4 (Defendant's Statement of Facts); ECF No. 347 at 7-8 (Plaintiffs' Responsive Statement of Facts). Plaintiffs contend that Lansing contacted PC's customers and sold to them directly, effectively cutting out Plaintiffs from any profit. ECF No. 1 at 5. However, Defendant disputes this. ECF No. 150 at 6.

At minimum, PGT, PC, and CWCP believed that Lansing breached the CMA by, *inter alia*, failing to provide profit and loss statements and other documentation, and depriving Plaintiffs of profits allegedly due under the terms of the CMA. ECF No. 299 at 4. As a result, PGT, PC, and CWCP sued Lansing, alleging breach of contract, breach of fiduciary duty, breach of covenant of good faith and fair dealing, unjust enrichment, interference with prospective advantage, misappropriation of a trade secret, and demanded an accounting. ECF No. 1. Lansing counterclaimed (1) against PGT for breach of contract; (2) against PC for breach of contract; (3) against PGT and PC for breach of covenant of good faith

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 6

and fair dealing; (4) against PGT for interference with prospective advantage; (5) against CWCP for tortious interference with contract; (6) against PGT, PC, and CWCP for breach of partnership/joint venture (pleading in the alternative); and (7) against PGT, PC, and CWCP for set off. ECF No. 150 at 20-25.

DISCUSSION

### A. Legal Standard

Summary judgment may be granted to a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to identify specific genuine issues of material fact which must be decided by a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law. *Id.* at 248. A dispute concerning any such fact is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* In ruling upon a summary judgment

motion, a court must construe the facts, as well as all rational inferences therefrom, in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).  Only evidence which would be admissible at trial may be considered. *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).

## B. Plaintiffs Bound by the CMA

A disputed material fact underlying several issues is who are the parties to the CMA.  Defendants assert in their statement of facts—and Plaintiffs do not dispute—that PGT and Lansing entered into the CMA. ECF No. 299 at 1. However, Lansing declares in its statement of facts that neither PC nor CWCP are parties to the CMA. ECF No. 299 at 2. Plaintiffs dispute this, arguing that PC believed it was obligated under the CMA to broker trades for Lansing, and that CWCP as a corn grinder was obligated under the CMA to secure corn to the specifications noted in Lansing's corn contracts (citing Paulson's deposition). ECF No. 347 at 3-4. Somewhat confusingly, Lansing counterclaims against PC for breach of the CMA in its second amended answer, noting that under the CMA, PC was obligated to broker trades for Lansing. ECF No. 150 at 21. Furthermore, PC is mentioned in the October 2003 Amended CMA, though it is in reference to how SG's profits will be distributed. ECF No. 150-1 at 9 ("At the end of every marketing period Lansing will distribute to SG 40% of all net operating profits over $75,000 minus 40% of all bad debt write off and ***100% of brokerage paid to***

***Paulson Commodities*.**" (emphasis in original)).  Additionally, there is a curious, repeated reference to "SG" in the contract.  Lansing admitted that it entered into the Corn Marketing Agreement with "TI 48-130-6798 (SG)" which consisted of Steve Paulson, Tom Walters, and Dennis Kyllo and was referred to as "SG" or "Steve's Group." Defendant's Second Amended Answer, ECF No. 150 at 4. **Accordingly, the Court finds that there is a genuine dispute of material fact as to whether PC and CWCP are also parties to the contract.**

### C. Breach of Contract

Plaintiffs' move for summary judgment on their breach of the CMA claims. Lansing moves for summary judgment on one aspect of damages. The Court considers each motion in turn.

#### 1. Plaintiffs' Motion on Breach of Contract

Plaintiffs argue that they are entitled to summary judgment on their breach of contract claim because Lansing (1) failed to provide the required accountings and documentation; (2) failed to provide necessary information to PC to broker trades; (3) refused to provide reasonable credit limits to end user corn purchasers in attempts to alienate them; and (4) refused to provide credit to and sell single truckload amounts to new and existing customers in furtherance of the CMA. ECF No. 340 at 6. Lansing contends in its responsive briefing that the parties'

fundamental dispute about how profit and loss are calculated bars resolution of this claim at summary judgment. ECF No. 373 at 3.

Here, the parties dispute many of the material facts underlying the breach of contract claim; taken in the light most favorable to the nonmoving party, the disputed facts defeat Plaintiffs' motion for summary judgment. The Court examines each of Plaintiff's contentions in turn.

Plaintiffs claim that Defendant failed to provide the required accountings and documentation, and that Defendant did not provide necessary information to PC to broker trades. ECF No. 340 at 6. Defendant contends that there are disputed material facts as to whether PGT did or did not receive sufficient information under the CMA, ECF No. 373 at 6, noting that Lapke provided a breakdown of profits, ECF No. 375 at 7 (citing Lapke Deposition at 201), and that PGT and Paulson had significant information about transactions processed under the CMA, ECF NO. 373 at 5 (citing Paulson Deposition at 150).

Plaintiffs also contend that Lansing breached its duties under the CMA by failing to use PC to broker trades. Lansing contends that PC was not a party to the CMA and that Paulson admitted in his deposition that the CMA did not require Lansing to use PC as its broker. ECF No. 373 at 9 (citing Paulson Deposition at 56). Thus, a question of fact remains whether Lansing was required to use PC to

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 10

broker its trades. See also discussion in Section B regarding questions of fact as to which parties were bound under the CMA.

Plaintiffs also contend that Lansing breached its duties under the CMA by changing and refusing to provide reasonable and rational credit limits to end user corn purchasers in attempts to alienate them. ECF No. 373 at 6. Lansing disputes that there is anything in the CMA prohibiting it from changing credit limits, and notes that the CMA makes clear that all contracts are subject to Lansing's company credit policy. ECF No. 373 at 9. Plaintiffs also argue that Lansing breached the CMA by failing to process single truckload amounts to new and existing customers. ECF No. 340 at 6. Lansing counters that the CMA did not require Lansing to provide single truckloads to such customers. ECF No. 373 at 10.

Generally, the parties dispute most of their obligations under the CMA. As Lansing argues, ECF No. 373 at 1, the contention that the contract has been breached ultimately turns on the issue of calculation of profit and loss under the CMA. The parties have each contended that the other has breached the CMA on different theories of how the profits and losses should be calculated. If Lansing is correct, then PGT owes Lansing for losses. If PGT is correct, Lansing owes PGT. The parties fundamentally disagree about how profits and losses should have been reported. Accordingly, and for the disputes of material fact above stated, **the Court**

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 11

**denies Plaintiffs' motion for summary judgment on the breach of contract
claim.**

       2.  <u>Defendant's Motion with Respect to Damages</u>

Lansing argues that it is entitled to summary judgment only on Plaintiffs'
claim for alleged freight rebate damages for breach of the CMA because the CMA
did not concern freight rebates. ECF No. 298 at 20. Lansing contends that
Plaintiffs acknowledged that the CMA does not refer to freight rebates, and thus
these are inappropriate for lost damages computations. *Id*. Plaintiffs contend that
"[r]ebates and incentives would have been discounts off the price associated with
purchase contracts and would absolutely factor into the sales price and profit
margin." ECF No. 347 at 5; ECF No. 353 at 3. Lansing counters that "freight
discounts" are defined in the CMA as "**additional** freight that may be paid to ship
corn outlined in the purchase and sales contracts," and as such were not rebates.
ECF No. 364 at 6 (emphasis in original). At bottom, Lansing's argument is that
since freight rebates were not mentioned or defined in the CMA, they can be
ignored for purpose of computing profit and loss attributable to the CMA. *Id*.

The Court acknowledges the contractual definition of "freight discounts"
does not apply to these rebates at issue. But the contract does not purport to define
each element of "profit and loss". Indeed, nowhere does the contract purport to
provide a definition for the cost of goods sold, a vital aspect of calculating profit

and loss.  Absent that, the most basic and rudimentary accounting principles would attribute the freight rebates to the cost center that generated them, that is, as a reduction to the cost of goods sold under the CMA.  **Accordingly, Defendant's motion for summary judgment on freight rebate damages is denied.**

### D. Partnership Accounting Claim

The Court next considers the parties' cross-motions for summary judgment on Plaintiffs' claim for a partnership accounting. Lansing argues for summary judgment on grounds that (2) there was no partnership with Lansing, and alternatively (2) that because PGT has elected to pursue a legal claim for breach of CMA in a jury trial, it cannot simultaneously pursue a bench trial for an accounting. ECF No. 298 at 17.  The Court considers each issue in turn.

1.  Whether PGT and Lansing Formed a Partnership or Joint Venture

Plaintiffs contend that PGT and Lansing entered into a joint venture to operate collectively under the CMA. ECF No. 340 at 16. They allege that, like a partnership, PGT and Lansing intended to operate as co-venturers under the CMA for the purpose of making a profit. *Id*. Defendant contends that the relationship formed by the CMA was not a partnership but a merchandising agreement. ECF No. 298 at 18.

"The essential elements of a joint venture are (1) a contract, express or implied; (2) a common purpose; (3) a community of interest; (4) an equal right to a

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 13

voice, accompanied by an equal right to control." *Paulson v. Pierce Cnty.*, 99

Wash. 2d 645, 654-55 (1983). An ownership or proprietary interest in the subject

matter of the enterprise by all parties is not essential to creation of a joint venture.

*Id*. In joint ventures, funds, property or labor are joined in common purpose, each

contributor has some right to direct conduct of others, losses and profits are shared,

and repayment of money advanced is not required absolutely, but is contingent

upon making a profit. *Liebergesell v. Evans*, 23 Wash.App. 357, 361 (1979),

review granted, reversed on other grounds, 93 Wash.2d 881 (1980).

Under the Revised Uniform Partnership Act ("RUPA"), codified at RCW

§ 25.05, "the association of two or more persons to carry on as co-owners a

business for profit forms a partnership, whether or not the persons intend to form a

partnership." RCW 25.05.055.

Here, at minimum, PGT and Lansing have (1) an express contract in the

form of the CMA. It defines their (2) "common purpose" in "market[ing] corn

from facility in Plymouth." *See* ECF No. 150-1. This creates their (3) "community

of interest" in the relationship that "generate[d] net operating profits to be split."

*See id*. Though the parties' agreement is silent as to (4) control, both have

significant responsibilities under the contract. Under the CMA, PGT agreed to

"provide destination marketing, truck logistics coordination, receivable collections

services to dairies and feedlots in the area around Plymouth," while Lansing agreed

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY
JUDGMENT ~ 14

to "provide BN shuttle transfer, corn merchandising expertise and management, accounting and credit services, and operating capital." ECF No. 12-2. Furthermore, the CMA provides for profit sharing: "activity resulting from this agreement will result in a relationship that will generate net operating profits to be split with 60% going to Lansing and 40% going to SG after the first $75,000 is designated to Lansing." ECF No. 150-1. In other words, PGT contributed its "labor" in the form of marketing and coordination while Lansing contributed "property" in the form of operating capital in order to generate "net operating profits." Thus, the parties' stated intentions fall squarely into the definition of a joint venture. The Court finds as a matter of law that a joint venture existed between PGT and Lansing. They may also have formed a partnership: Under RUPA, whether or not the parties' intended to form a partnership is irrelevant; thus, Lansing's contention that the parties said they formed a merchandising agreement rather than a partnership does not preclude them from unintentionally forming a partnership.[3]

However, there is a genuine issue of material fact as to whether PC and CWCP are parties to the CMA. Because the written CMA forms the basis for

---

[3] The Court refers to the relationship as a joint venture while recognizing that the duties and remedies for either a partnership or joint venture are fundamentally the same.

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 15

PGT's and Lansing's joint venture, its lack of clarity about whether PC and CWCP are also parties means there is an unresolved issue of fact. It is clear that Paulson's interest in Paulson Commodities became apparent to Lansing because the CMA was amended in October 2003 to provide that "Lansing will distribute to SG 40% of all net operating profits over $75,000 minus 40% of all bad debt write off and 100% of brokerage paid to Paulson Commodities." ECF 150-1 (emphasis in original). Accordingly, the question of whether PC and CWCP were also parties to the Lansing/PGT joint venture is unresolved for purposes of summary judgment.

      2. Whether Plaintiffs Have a Cause of Action for an Accounting

      The Court next determines whether Plaintiffs have a cause of action for an accounting of the joint venture. In Count IV of their complaint, Plaintiff PGT demands from Lansing:

> an accounting, and reconciliation, as well as all monthly, and yearly profit and loss statements, and any other account statements directly or indirectly related to the partnership, and any underlying documentation, including but not limited to profits, losses, expenses, and operating capital, management, and other accounting items relating to the parties' partnership for the last six years."

ECF No. 1 at 9. PGT moves for summary judgment on the issue of accounting, arguing that a cause of action for accounting accrues at dissolution and that partners have a statutory right to a settlement of accounts upon cessation of business activities, but Lansing "continuously refuses to provide an accurate reporting of profit relating to all activity under the CMA." ECF No. 340 at 16.

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 16

The Court first notes that an accounting is generally available to joint ventures and partnerships. A joint venture "is in the nature of a partnership, and the rights, duties and liabilities of joint adventurers are generally subject to the rules applicable to partnerships*." Rains v. Walby*, 13 Wash.App. 712, 720 (1975).  In a joint venture,

> [t]here is a right to an accounting between joint adventurers to determine their respective interests and liabilities. Following the reasoning that a joint adventurer has similar rights to those of a partner, we look to the law of partnerships to determine a partner's rights to an accounting.

*Id*. at 721.

In Washington, the operation of partnerships and rights and obligations of a partnership's individual members are expressly governed by statute. *See generally* Title 25 RCW. The Revised Uniform Partnership Act ("RUPA") expressly supersedes the common law governing partnerships. RCW 25.05.015(1); *Simpson v. Thorslund*, 151 Wash.App. 276, 282 (2009).   RUPA provides in part, "[a] partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to… [e]nforce the partner's rights under the partnership agreement…." RCW  25.05.170.[4] Additionally, "[e]ach partner is entitled to a settlement of all

---

[4] Prior to the adoption of RUPA, a partner was generally barred from bringing suit against a former co-partner regarding partnership liabilities without first bringing

partnership accounts upon winding up the partnership business….”

RCW 25.05.330.[5]

Here, Plaintiffs' demand an accounting along with other claims for relief to enforce rights under the partnership. ECF No. 1. Thus, Plaintiff is "enforce[ing] its rights under the partnership agreement" (the CMA) by "maintain[ing] and action…against another partner for legal or equitable relief, with…an accounting

---

an action to account for and settle the partnership's affairs. *Simpson*, 151 Wash.App. at 282. Since the adoption of RUPA in 1998, however, Washington law no longer requires such an accounting. *Id.*

[5] Plaintiffs contend in their motion for summary judgment that a cause of action for accounting accrues at dissolution, citing *Malnar v. Carlson*, 128 Wash.2d 521 (1996), which bases this assertion on the now superseded RCW 25.04.430. Under the common law, to state a cause of action for an accounting, a plaintiff must establish: "(1) a fiduciary relation existed between the parties, or that the account is so complicated that it cannot be conveniently taken in an action at law; and (2) the plaintiff has demanded an accounting from the defendant and the defendant has refused to render it." *State v. Taylor*, 58 Wash.2d 252, 262 (1961) (*citing Seattle National Bank v. School Dist. No. 40*, 20 Wash. 368 (1898)).

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 18

as to partnership business," as permitted by RUPA. *See* RCW 25.05.170.

Furthermore, the parties agree that the CMA has been terminated, although it is

unclear to the Court when that termination occurred. As Lansing notes in its

Second Amended Answer, "Lansing admits that Lansing and PGT continued their

relationship under the Corn Marketing Agreement until the summer of 2009, at

which time the Plaintiffs breached the Corn Marketing Agreement by unilaterally

terminating it, or attempting to unilaterally terminate it, without cause or written

notice." ECF No. 150 at 6.

3.  Whether PGT can pursue a bench trial for accounting

The Court next considers whether a jury trial or a bench trial is appropriate

for cases involving both a claim for a partnership accounting, which is a claim in

equity,[6] and a breach of contract claim, a claim in law. Lansing contends that

because PGT is pursuing a legal claim for breach of the CMA before a jury it

cannot simultaneously pursue a bench trial for accounting. ECF No. 298 at 18. It

further alleges that Plaintiffs' evidentiary presentation in a jury trial "will

essentially be each party presenting the accounting it claims is required by the

---

[6] Seeking an accounting, where the accounting is not provided for by contract, is an

equitable remedy. *Petrella v. Metro-Goldwyn-Mayer, Inc.,* 695 F.3d 946, 956 (9th

Cir. 2012) *cert. granted,* 134 S. Ct. 50 (2013) (citing *Dairy Queen, Inc. v. Wood,*

369 U.S. 469, 478 (1962)).

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY
JUDGMENT ~ 19

CMA," and therefore there would be no need for the equitable relief of an accounting. *Id.* at 19.

First, the Court notes that it finds no support for the proposition that PGT cannot simultaneously pursue a bench trial for an accounting while it pursues a legal claim for breach of the CMA.[7] Rather, in cases involving questions of both equity and law, courts must determine whether legal or equitable claims predominate. *Auburn Mech., Inc. v. Lydig Const., Inc.,* 89 Wash.App. 893, 898 (1998). Article I, section 21 of the Washington constitution "has been held to guarantee a right to a jury trial where the civil action is purely legal in nature, but not where the action is purely equitable in nature." *Id.* at 897. But doubts should be "resolved in favor of a jury trial." *Id.* In determining the primary nature of an action, the following factors are considered:

> (1) who seeks the equitable relief; (2) is the person seeking the equitable relief also demanding trial of the issues to the jury; (3) are the main issues primarily legal or equitable in their nature; (4) do the equitable issues present complexities in the trial which will affect the orderly determination of such issues by a jury; (5) are the equitable and legal issues easily separable; (6) in the exercise of such discretion, great weight should be given to the constitutional right of trial by jury and if the nature of the action is doubtful, a jury trial should be allowed; (7) the trial court should go

---

[7] Defendant cites *Roediger v. Reid*, 133 Wash. 608, 609 (1925), which holds that the trial court properly denied a jury trial where the question was whether a partnership was established, an equitable claim.

> beyond the pleadings to ascertain the real issues in dispute before making the determination as to whether or not a jury trial should be granted on all or part of such issues.

*Id.* at 898 (quoting *Scavenius v. Manchester Port Dist.,* 2 Wash.App. 126, 129–30, 467 P.2d 372 (1970) (approved and adopted in *Brown [v. Safeway Store, Inc.],* 94 Wash.2d at 368, 617 P.2d 704 [1980])).

In cases involving both equitable and legal claims, courts have left open the possibility of ordering that the legal claims be tried with a jury, and the equitable claims be tried separately, without a jury. *See Auburn Mechanical*, 89 Wash.App. at 898 (quoting *Scavenius,* 2 Wash.App. at 129-30 ("the trial court should go beyond the pleadings to ascertain the real issues in dispute before making the determination as to whether or not a jury trial should be granted *on all or part of the issues*") (emphasis added)); *see also* 14 Wash. Prac., Civil Procedure § 10:13 (2d ed.) ("The guidelines…also seem to contemplate the possibility of separate trials."). *See also Green v. McAllister*, 103 Wash.App. 452 (2000) (reviewing Superior Court case in which jury heard a breach of contract claim and the court entered findings and a judgment on the accounting action at the same time); *Box v. Crowther*, 3 Wash.App. 67, 68 (1970) (reviewing Superior Court case in which breach of contract claim was tried with a jury, though "court quite properly declined to permit the jury to decide the accounting aspects of the case and submitted to the jury only the questions of damages to the plaintiffs").

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 21

4. Accounting

RUPA provides

In settling accounts among the partners, profits and losses that result from
the liquidation of the partnership assets must be credited and charged to the
partners' accounts. The partnership shall make a distribution to a partner in
an amount equal to any excess of the credits over the charges in the partner's
account. A partner shall contribute to the partnership an amount equal to any
excess of the charges over the credits in the partner's account, except, in the
case of a limited liability partnership the partner shall make such
contribution only to the extent of his or her share of any unpaid partnership
obligations for which the partner has personal liability under RCW
25.05.125.

RCW 25.05.330.

 "In an action for an accounting, 'the court (or more commonly, an auditor,

master, or referee subject to court review) conducts a comprehensive investigation

of the transactions of the partnership and the partners, adjudicates their relative

rights, and enters a money judgment for or against each partner according to the

balance struck.'" *Guntle v. Barnett*, 73 Wash.App. 825, 830 (1994) (quoting  2

Alan R. Bromberg and Larry E. Ribstein, *Partnership,* § 6.08(a) (1994)); *see also*

*Holman v. Cape,* 45 Wash.2d 205, 206 (1954) (quoting *Yarwood v. Billings,* 31

Wash. 542 (1903)) (in action for accounting, trial court has power "not only to

state the account between the parties but to enter a judgment in favor of one and

against another, as the state of the account may require."). "When an action for an

accounting is being used to wind up the partnership's affairs, the court is obligated

to provide 'for a full accounting of the partnership assets and obligations and

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY
JUDGMENT ~ 22

distribution of any remaining assets or liabilities to the partners in accordance with their interests in the partnership.'" *Guntle*, 73 Wash.App. at 830 (citing *Box v. Crowther,* 3 Wash.App. 67, 77–78 (1970)). Whether to appoint an accountant is a matter addressed to the sound discretion of the court. *See Guntle*, 73 Wash.App. at 830-31 ("Other jurisdictions have held that whether to appoint an accountant is a matter addressed to the sound discretion of the trial court....Washington cases seem in accord, or at least consistent.").

The partner controlling the records has the burden of proof of the account's accuracy. *Cederlund v. Cederlund*, 7 Wash.App. 320, 321 (1972) (quoting *In re Tembreull's Estate*, 37 Wash.2d 93 (1950)) ("When a managing partner who keeps the books is [sued] for settlement, he must sustain the burden of proof of the correctness of the account. . . .'"; "'[I]f they are so kept as to be unintelligible… every presumption will be made against those to whose negligence or misconduct the non-production of proper accounts is due.'").

Here, the claims remaining are both in equity (the partnership accounting claim) and in law (the breach of contract claim). Because the breach of contract claim is significant, the parties are entitled to a jury trial on those issues. However, the accounting—to which the Court has found Plaintiffs are entitled above—involves complex and specialized financial issues pertaining to the grain industry. Such a complex accounting would be difficult for a jury to properly decide and is

reserved for the equity court. Accordingly, the Court will bifurcate the claims in equity from the claims at law, providing a bench trial for the accounting followed by a jury trial for the remaining issues at law. Doing so allows the parties to have the jury trial to which they are entitled, as well as an accounting.

The Court will hold the bench trial for an accounting first. The accounting may clarify issues at the heart of some of the breach of contract issues. Such an accounting, performed prior to a jury trial, has the potential to greatly reduce the complexity of the issues remaining for the jury.  At this time, the Court declines to appoint an auditor or master.

### E. Breach of Fiduciary Duty

Lansing moves for summary judgment on the issue breach of fiduciary duty, arguing that neither PGT, PC, nor CWCP were partners in the alleged partnership, and therefore Lansing could owe them no fiduciary duty. ECF No. 298 at 3. Plaintiffs move for summary judgment on the breach of fiduciary duty claim. ECF No. 340 at 9.  Plaintiffs appear to assert in the complaint that the fiduciary duty arose out of a partnership. *See* ECF No. 1 at 7 ("Lansing has a fiduciary duty to the partnership"). However, Plaintiffs' motion for summary judgment rather argues that the parties "both admit that trust is an integral part of commodity trading because million dollar transactions are made by phone," and that it is "understandable that Plaintiffs relied on that trust when transacting the activity

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 24

under the CMA on behalf of Lansing." ECF No. 340 at 10. To this argument,

Lansing responds that Plaintiffs cannot meet their burden to show that Lansing had

a fiduciary duty to any Plaintiffs. ECF No. 373 at 10.

In a fiduciary relationship one party "'occupies such a relation to the other

party as to justify the latter in expecting that his interests will be cared for....' "

*Liebergesell v. Evans,* 93 Wash.2d 881, 889–90 (1980) (quoting Restatement of

Contracts § 472(1)(c) (1932)). Breach of a fiduciary duty imposes liability in tort.

*Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 110 Wash.App. 412,

433 (2002). The plaintiff must prove (1) existence of a duty owed, (2) breach of

that duty, (3) resulting injury, and (4) that the claimed breach proximately caused

the injury. *Id*. at 433-34 (citing *Miller v. U.S. Bank of Wash.,* 72 Wash.App. 416,

426 (1994)). A fiduciary relationship arises as a matter of law in certain contexts

such as trustee and beneficiary, principal and agent, and partner and partner. *Id*.

Plaintiffs tangentially re-assert the partnership argument with Lansing in

their responsive memorandum, arguing that the parties' efforts under the CMA

were often referred to as a joint venture, joint position, or partnership. ECF No.

350 at 15 (citing Exhibits 66-69, 71, 144-145). Because the Court has determined

that Lansing and PGT formed a joint venture through the CMA, a fiduciary duty

between those two entities arises as a matter of law. *See Lybrand*, 110 Wash.App.

at 433. Accordingly, the Court grants partial summary judgment to Plaintiffs on the

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY
JUDGMENT ~ 25

issue of whether a fiduciary relationship and thus fiduciary duties exist between Lansing and PGT. The question of whether Lansing breached a fiduciary duty is inextricably intertwined with whether Lansing breached the contract, and thus genuine issues of material fact remain on the issue of breach and damages. **Accordingly, these issues are preserved for the jury trial and cannot be decided on summary judgment with respect to PGT.**

However, there remains a dispute about whether PC or CWCP were parties to the CMA, and, consequently about whether they were parties to the joint venture with Lansing. If they were joint venturers, then fiduciary duties are owed.

Plaintiffs also argue that fiduciary duties arise in other contexts than relationships producing fiduciary duties as a matter of law. Thus, the Court considers whether a quasi-fiduciary relationship in fact arose between Lansing and PC and CWCP. As a general rule, participants in a business transaction deal at arm's length and do not enter into a fiduciary relationship. *Liebergesell,* 93 Wash.2d at 889. But special circumstances may establish a quasi-fiduciary relationship in fact where one would not normally arise in law. *Annechino v. Worthy*, 162 Wash.App. 138, 143 (2011), *aff'd,* 175 Wash.2d 630 (2012). "'The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party.'" *Goodyear Tire & Rubber Co.*

*v. Whiteman Tire, Inc.*, 86 Wash.App. 732, 742 (1997) (quoting *Burwell v. South*

*Carolina Nat'l Bank,* 340 S.E.2d 786, 790 (1986)). In other words, the plaintiff

must show some dependency on his or her part and some undertaking by the

defendant to advise, counsel and protect the weaker party. *Id. See also*

*Liebergesell*, 93 Wash.2d at 884-85 (sufficient evidence of fiduciary relationship to

overcome summary judgment where businessman induced a widowed school

teacher to lend him money at 20 percent interest rate, even though he knew that

rate was illegal). In *Goodyear*, the court found that counterclaim plaintiff had not

created an issue of fact sufficient to avoid summary judgment where, though tire

dealer was vulnerable, tire manufacturer was clearly interested in promoting itself

as demonstrated by its reservation of right to compete. *Id*. at 743 ("the existence of

conflicting profit incentives between a manufacturer and dealer is at odds with a

fiduciary relationship").

Plaintiffs' claim that their trust relationship with Lansing (which gives rise

to a fiduciary duty) stems from the relationship formed under the CMA. But PC's

and CWCP's relationship to the joint venture remains a disputed factual question.

Plaintiffs allege that PC was to broker trades and that CWCP was to secure the

corn to the specifications provided by the sale contracts forwarded by Lansing, and

that the total effort was often referred to as "joint venture" or "partnership." ECF

No. 350 at 15.

However, outside a partnership/joint venture, Plaintiffs have not indicated how their business relationship—in which PC brokered trades and CWCP procured and ground corn—is one giving rise to an expectation that Lansing would care for PC or CWCP's welfare, or act primarily for the benefit of CWCP, or was one where PC/CWCP was dependent or weak. Indeed, both PC and CWCP admit they were fully paid for their services.[8] ECF Nos. 302 at ¶ 106; 304 at ¶ 364; 375-1 at 68-69 (Walter's trucking was also paid in full for its services). Plaintiffs have failed to establish a genuine issue of material fact to defeat summary judgment. No other special relationship existed between the parties which would impose fiduciary duties. Thus, absent a finding that PC and CWCP were parties to the partnership/joint venture, Defendant is entitled to summary judgment that there was no other basis for imposition of fiduciary duties owed to PC and CWCP.

**Accordingly, Defendant's motion for summary judgment is partially granted that no fiduciary duties are owed to PC and CWCP outside the CMA.**

### F. Breach of Duty of Good Faith and Fair Dealing

Plaintiffs move for summary judgment on their claim that Lansing breached the duty of good faith and fair dealing. ECF No. 340 at 12. Lansing counters that

---

[8] Paulson now complains that PC was shorted $8,000 in broker fees for a single transaction.  ECF No. 302 at ¶ 106.  But that does not create a fiduciary relation.

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 28

the duty only arises with respect to specific contract obligations and that if no contractual duty exists, there is nothing that must be performed in good faith. ECF No. 373 at 14. Lansing also moves for summary judgment on this claim, arguing that PC and CWCP are not parties to the CMA and thus there is no relationship with Lansing on which the covenant of good faith and fair dealing could be based. ECF No. 298 at 4.

In Washington, every contract carries with it an implied covenant of good faith and fair dealing that obligates the parties to cooperate with one another so that each may obtain the full benefit of performance. *Frank Coluccio Constr. Co., Inc. v. King County,* 136 Wash.App. 751, 764 (2007) (citing *Badgett v. Sec. State Bank,* 116 Wash.2d 563, 569 (1991)). The covenant of good faith applies when the contract gives one party discretionary authority to determine a contract term; it does not apply to *contradict* contract terms. *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.,* 86 Wash.App. 732, 738 (1997). That a party can breach the duty of good faith and fair dealing by acting dishonestly or unlawfully does not mean that dishonesty or an unlawful purpose is a necessary predicate to proving bad faith. *Scribner v. Worldcom, Inc.,* 249 F.3d 902, 910 (9th Cir. 2001) (applying Washington law).

Here, Plaintiffs simply have not established undisputed facts sufficient for summary judgment. As discussed at greater length above, there are genuine issues

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 29

of material fact as to which party breached the CMA and how. For example, Plaintiffs contend that Lansing failed to disclose expenses and profits, and monthly and annual P&L's. ECF No. 340 at 14. However, Lansing disputes this. ECF No. 375 at 7 (citing Lapke Deposition at 201). The duty of good faith and fair dealing is inextricably intertwined with the explicit duties under the contract, about which there are disputed material facts.  Any undisputed facts that Plaintiffs assert simply are not enough to show a breach of the duty of good faith and fair dealing for the purposes of summary judgment. For example, Plaintiffs argue that Lansing's profit and loss statements were never audited, which Lansing does not dispute (though Lansing objects to the underlying exhibit on authentication grounds). ECF No. 340 at 14; ECF No. 375 at 5. But this, standing alone, is not enough. **Accordingly, Plaintiffs' motion for summary judgment on the issue of breach of the duty of good faith and fair dealing fails, and these issues will be tried with the breach of contract claim.**

Because there is a question of fact as to whether PC and CWCP are parties to the CMA, there is likewise a question of material fact as to whether there was a duty of good faith and fair dealing as to them. **Accordingly, Defendant's motion for summary judgment as to PC and CWCP on the breach of the duty of good faith and fair dealing also fails.**

///

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 30

**G. Unjust Enrichment Claim**

Plaintiffs claim that they are entitled to summary judgment on their unjust

enrichment claim because, inter alia, Lansing benefitted from PC's negotiations

and brokering, and was unjustly enriched by profits it made on arbitrage and

diversion, discounts, and other activities in which it denied PC brokerage fees.

ECF No. 340 at 19. Lansing moves for summary judgment as well, arguing (1) that

PGT's unjust enrichment claim fails because Washington law precludes a party to

a contract from asserting an unjust enrichment claim for damages arising from a

transaction about which the parties have a contract, and (2) that PC and CWCP

have no unjust enrichment claim because they were not parties to the CMA and

thus could not have bestowed any benefit on Lansing, as required for an unjust

enrichment claim. ECF No. 298 at 15.

"Unjust enrichment is the method of recovery for the value of the benefit

retained absent any contractual relationship because notions of fairness and justice

require it." *Young v. Young,* 164 Wash.2d 477, 484, 191 P.3d 1258 (2008).

> Three elements must be established in order to sustain a claim based on
> unjust enrichment: a benefit conferred upon the defendant by the plaintiff; an
> appreciation or knowledge by the defendant of the benefit; and the
> acceptance or retention by the defendant of the benefit under such
> circumstances as to make it inequitable for the defendant to retain the benefit
> without the payment of its value.

*Id.* (*internal citations omitted* ). A claim for unjust enrichment is based on the

doctrine of implied contract. *MacDonald v. Hayner,* 43 Wash.App. 81, 85, 715 P.2d 519 (1986).Under Washington law, "[a] party to a valid express contract is bound by the provisions of that contract, and may not disregard the same and bring an action on an implied contract relating to the same matter, in contravention of the express contract." *U.S. for Use and Benefit of Walton Technology, Inc. v. Weststar Engineering, Inc.,* 290 F.3d 1199, 1204 (9th Cir. 2002) (dismissing unjust enrichment claim where Plaintiff had affirmed the validity of the contract).

Here, as Lansing argues, Plaintiffs have claimed breach of contract—a claim premised on its acknowledgment of the existence of a contract with Lansing. ECF No. 1 at 7. PGT is undisputedly a party to the CMA, and Plaintiffs' unjust enrichment claims arise from the same facts that give rise to their breach of contract claims. Accordingly, Plaintiffs' unjust enrichment claim fails as to PGT. PGT must pursue damages under its breach of contract claim.

In their reply, Plaintiffs appear to acknowledge Lansing's exclusion of PGT from the unjust enrichment claim, but argue that "if any party is found to be outside the CMA, it should certainly be entitled to compensation because of unjust enrichment which would otherwise accrue to Defendants." ECF No. 350 at 11. A dispute remains about whether PC and CWCP are parties to the CMA: if they are parties, they must also pursue their damages under a breach of contract claim; if

they are not parties they have come forward with insufficient evidence to support

an implied contract/unjust enrichment cause of action.

CWCP has identified no unjust enrichment claims.  As indicated above,

CWCP was fully paid for its services.  ECF No. 304 at ¶ 364.  PC has identified

only one transaction that it claims it brokered for Lansing in which it claims

Lansing reduced its fee by $8,000.   Paulson Declaration, ECF No. 302 at ¶ 106.

The refusal of Lansing to pay $8,000 brokering fee on a single transaction does not

constitute an unjust enrichment cause of action.  Otherwise, PC has failed to come

forward with sufficient admissible evidence to establish an unjust enrichment

cause of action.  PC complains that Lansing made money on arbitrage, diversion

and discounts, but does not otherwise support these allegations with any specific

evidence that would establish the elements of an unjust enrichment claim. PC, as a

broker, could expect its broker fees, but it certainly is not entitled to the reward that

a speculator in the grain market achieves.  Indeed, PC's money was not at risk.

**Thus, Lansing's motion for summary judgment on Plaintiffs' unjust**

**enrichment claims is granted.**

### H. Tortious Interference

Lansing moves for summary judgment on Plaintiffs' claim of tortious

interference with a business expectancy. ECF No. 298 at 2. It contends that (1)

there is no evidence that Lansing interfered with AGNW's lease with CWCP at the

Plymouth Facility, (2) there is no evidence that Lansing wrongfully interfered with any relationship PC had with the two local customers PC has identified as having bought corn from Lansing, and (3) that Lansing cannot be liable for interference with its own contract. ECF No. 298 at 5, 8. Plaintiffs counter that, though Lansing has provided support for its contentions, other, contradictory evidence exists. ECF No. 350 at 4.

To prove tortious interference, the plaintiff must produce evidence sufficient to support all the following findings: (1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of and intentional interference with that relationship or expectancy; (3) a breach or termination of that relationship or expectancy induced or caused by the interference; (4) an improper purpose or the use of improper means by the defendant that caused the interference; and (5) resultant damage. *Leingang v. Pierce County Med. Bureau, Inc .,* 131 Wash.2d 133, 157 (1997). The party moving for summary judgment has the burden to show the absence of evidence that would raise an issue of material fact regarding any of the five elements of the tortious interference claim. *Atherton Condo. Apartment–Owners Ass'n Bd. of Dir. v. Blume Dev. Co.,* 115 Wash.2d 506, 516 (1990).

A valid "business expectancy" includes any prospective contractual or business relationship that would be of pecuniary value. *Manna Funding, LLC v.*

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 34

*Kittitas Cnty.*, 173 Wash.App. 879, 897, 295 P.3d 1197, 1207, as amended on denial of reconsideration (Apr. 9, 2013), *review denied,* 178 Wash.2d 1007, 308 P.3d 642 (2013). "All that is needed is a relationship between parties contemplating a contract, with at least a reasonable expectation of fruition," and this "relationship must be known, or reasonably apparent, to the interferor (sic)." *Manna*, at 897 (finding trial court's grant of summary judgment on tortious interference claim proper because there was no evidence that defendant interfered with or delayed development activity where plaintiff had no identified contract, permit or contemplated development). Intentional interference requires an improper objective or the use of wrongful means that in fact cause injury to the person's contractual relationship. *Leingang,* 131 Wash.2d at 157. But exercising in good faith one's legal interests is not improper interference. *Leingang,* 131 Wash.2d at 157 (finding no improper interference in an insured's claim that one insurer tortiously interfered with his contract with another insurer where insurer was asserting an arguable interpretation of existing law). The tort of interference with a business expectancy requires a third party; a party to the contract cannot be liable in tort for inducing its own breach. *City of Seattle v. Blume*, 134 Wash.2d 243, 266 (1997).

Here, even taken in the light most favorable to them, Plaintiffs have failed to establish that there is a genuine issue of material fact regarding the elements of

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 35

their claim. First, insofar as Plaintiffs' claims for tortious interference relate to the relationship between Lansing and PGT, the Court notes that a party to the contract cannot be liable in tort for inducing its own breach. *Blume*, 134 Wash.2d at 266. Accordingly, the claim fails as to the relationship between Lansing and PGT, since they had a contractual relationship with each other.

Next, the Court notes that there must be "a breach or termination of that relationship or expectancy induced or caused by the interference." *Leingang*, 131 Wash.2d at 157. Defendant argues that Plaintiffs fail to meet this necessary element with respect to their claims that Lansing interfered with the business relationship with CWCP, PC, CP or Walters because Plaintiffs have not alleged in the complaint nor provided additional evidence that there was a breach or termination of any symbiotic relationship between PGT and those parties. ECF No. 298 at 10. The Court agrees. Plaintiffs have provided no evidence of a "breach or termination of expectancy" with respect to CWCP, PC, CP or Walters. This is not surprising, since PGT is 98-percent-owned by CWCP; CWCP is equally owned by Paulson, Kyllo, and Walters; PC is owned by Paulson; CP is owned by Kyllo; and Walters, Inc., is owned by Walters.

With respect to Plaintiffs' claims that Lansing acted wrongfully by making direct contact and sales with PC and CP's customers, ECF No. 350 at 6, the Court notes that the parties do not appear to have had a noncompetition agreement. Thus,

there is no indication that Lansing's direct contact with those customers was improper, as they were exercising a legal right with respect to these customers. If they were contacted during the CMA, that was allowed. If they were contacted afterward, there was no contractual obligation preventing them from doing so.

Paulson's declaration additionally identifies two customers, Smeenk[9] and Desert Oasis, that he alleges Lansing called and told they did not need to pay PGT for their corn if they used Lansing for their broker instead of PGT. ECF No. 302 at ¶ 105 (Paulson Declaration). Paulson contends that Smeenk and Desert Oasis owed more than $70,000 to PC at the time of the lawsuit. *Id*. However, Defendant counters that Jason Smeenk stated that he "was never told by Rebecca, or anyone else, that [his] dairy would not have to pay outstanding balance due to Paulson Commodities if [he] bought corn directly from Lansing." ECF No. 299-3 at 2 (Declaration of Jason Smeenk). He went on to say that his "corn purchases from Lansing were motivated by price as well as a good working relationship with Ms. Wallick [of Lansing]." *Id*. Likewise, Richard Smith, owner of Desert Oasis, declared that, to the best of his recollection he had "never had direct contact with Lansing Grain Company" or "Plymouth Grain Terminals." ECF No. 299-4 at ¶ 6-7. He also declared that he made corn purchases for Desert Oasis through a broker at NorthWest Feed, who he believed bought corn for his business from "whichever

---

[9] The parties sometimes incorrectly refer to Smeenk as "Schmenk."

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 37

corn dealer had the cheapest price at the time I wished to make a purchase, and that would vary from week to week." *Id*. at ¶ 3.  Thus, Plaintiffs have identified no admissible evidence that Lansing improperly interfered with its business expectancies with Smeenk or Desert Oasis, and summary judgment on this claim fails as to these customers.

Plaintiffs offer the most extensive argument with respect to its relationship with AgriNorthwest.  First, Plaintiffs contend that Wayne Park told Tom Walters that AgriNorthwest did not renew its lease because there were issues with the Lansing contract. ECF No. 350 at 4, citing Facts in Opposition, para. 17.  But this hearsay statement is not enough to defeat summary judgment. Plaintiffs cite Paulson's second declaration, which states that there are email exchanges[10]

> involving AgriNorthwest where (1) [Rebecca] Wallick [of Lansing] asked AgriNorthwest to divulge information about PGT to Wallick, (2) Wallick asked AgriNorthwest not to release corn loads to PGT that PGT had purchased from Lansing, (3) Wallick asked AgriNorthwest to 'monitor' PGT and CWCP and give reports to Wallick, (4) and Wallick created discord between the parties involved.

ECF No. 353 at 8. However, Defendant presented evidence from AgriNorthwest employee Wayne Park asserting that the non-renewal of CWCP's lease at

---

[10] Plaintiffs note that they were told that Rhonda Giusti of AgriNorthwest, who was allegedly contacted by Lansing and asked not to release loads, had passed away prior to the lawsuit's initiation.

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 38

AgriNorthwest's facility was due to the fact that AgriNorthwest was considering doing the grinding itself, and they wanted more control over the facility. ECF No. 299-5 at 10 (Deposition of Wayne Park). Furthermore, Plaintiffs did not dispute Defendant's statement of fact that AgriNorthwest was within its contractual rights when it did not renew the lease with CWCP. ECF No. 299 at 8.

Plaintiffs argue that "Defendants' refusal to bring corn into AgriNW led to CWCP's grinder sitting idle generating no revenue[.] This caused CWCP to use its Richland facility to receive corn. According to Paulson, this occurred before CWCP's lease at AgriNW was terminated but is believed to be a contributing factor." ECF No. 350 at 5. However, though Paulson stated in his second declaration that "it was clear" to him that Park did not want to renew the lease because of "discord between Lansing and PGT," he goes on to state that "Park thought he could obtain CWCP's grinding equipment for cheap and AgriNorthwest could do their own grinding." ECF No. 353 at 8. Thus, Paulson's own declaration indicates that AgriNorthwest may have terminated the lease because of its desire to obtain CWCP's grinding equipment and do its own grinding—a motive seemingly unconnected from any alleged interference by Lansing.

Plaintiffs claim they are entitled to call Wayne Park as a witness and confront him at trial as to his reasoning, presumably to establish that Lansing was the catalyst for the lease termination. ECF No. 350 at 5. But that tactic defeats the

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 39

purpose of the summary judgment and does not satisfy Plaintiffs' burden at this stage of the proceeding.  Moreover, the Court notes that AgriNorthwest also terminated its Grain Transfer Agreement with Lansing.  ECF No. 304 at 22-23. The significance being that neither Lansing nor PGT had a foothold at the Plymouth facility any longer, and neither gained an advantage.

Plaintiffs note that "Defendants stopped giving PC offers or bids after 2007 and cut PC out of brokerage for those sales. This caused CWCP and PGT to send shipments to its Richland location, creating perceived competition between AgriNW and Plaintiffs." ECF No. 350 at 5. But here, Plaintiffs have failed to show that there was "knowledge of and intentional interference with that relationship or expectancy" as required for the tort. Defendant may well have cut PC out of brokerage—a question that goes to its relationship with PC. But there is no indication that it did so to disrupt CWCP's relationship with AgriNorthwest.

**Accordingly, the Court finds that there is insufficient evidence to support the elements for Plaintiffs' claim of tortious interference with a business expectancy.**

## I. Misappropriation of Trade Secrets

Lansing moves for summary judgment on Plaintiff  PC's claim that Lansing misappropriated trade secrets on grounds that (1) PC voluntarily gave the list to Lansing; (2) the customer lists in question were publicly available information; (3)

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 40

PC took no steps to protect that information; (4) and PC identified no damages. ECF No. 298 at 2-3.

The Uniform Trade Secrets Act ("UTSA") prohibits misappropriation of trade secrets. RCW 19.108.  Washington law defines a trade secret as

> information, including a formula, pattern, compilation, program, device, method, technique or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RCW § 19.108.010(4). A customer list is one of the types of information which can be a protected trade secret if it meets the criteria of the UTSA. *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash.2d 427 (1999). "[W]hether a customer list is protected as a trade secret depends on three factual inquiries: (1) whether the list is a compilation of information; (2) whether it is valuable because unknown to others; and (3) whether the owner has made reasonable attempts to keep the information secret*." Ed Nowogroski*, 137 Wash.2d at 442.

For a trade secret to exist, the underlying information must not be "readily ascertainable by proper means" from some other source. *Boeing Co. v. Sierracin Corp.*, 108 Wash.2d 38, 49–50 (1987). A compilation of information may constitute a trade secret even though the plaintiff cannot prove that every element of the compilation is unavailable elsewhere. *Id.* at 50. Trade secrets frequently contain elements that by themselves may be in the public domain, but which

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 41

together qualify as trade secrets. *Id.* On the other hand, when the information is in the public domain, and the end product of the information is unoriginal, there is no trade secret. *Woo v. Fireman's Fund Ins. Co*., 137 Wash.App. at 488–89 (combination of public data must be novel and unique*); Buffets, Inc. v. Klinke*, 73 F.3d 965 (9th Cir. 1996) (suggesting plaintiff must prove novelty to establish trade secret under Washington law).

Trade secrets are not lost merely by such factors as confidential disclosures to such persons as employees or suppliers. *Boeing,* 108 Wash.2d at 52. When the information is given out to employees without advising them of its confidentiality, or of measures to be taken to prevent it being obtained by others, security efforts may not be reasonable, even if the defendant actually obtains the information by improper means. *Buffets, Inc. v. Klinke*, 73 F.3d at 968. A misappropriation may sometimes be based on a duty to maintain secrecy. RCW 19.108.010(2)(b). A confidential relationship imposes an obligation not to disclose a trade secret or use it for other purposes. *Pacific Aerospace & Elecs., Inc. v. Taylor,* 295 F.Supp.2d 1205, 1212 (E.D. Wash. 2003) (applying Washington law).[11]

---

[11] See also the relevant Washington Pattern Jury Instruction:

> "Misappropriation" of a trade secret means acquisition, disclosure, or use of a trade secret without the express or implied consent of the owner of the trade secret by a person who:
> > (1) Used improper means to acquire the trade secret; or

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 42

Here, even in the light most favorable to them, Plaintiffs have failed to satisfy the last prong of the test: whether the owner has made reasonable attempts to keep the information secret. In a related argument, Lansing contends that it has no confidentiality obligations with respect to the lists. ECF No. 298 at 13. The Court agrees. Plaintiffs argue that, while PC did surrender the customer files and information to Lansing as part of the CMA (so they could be approved for credit terms), such a surrender is not "voluntary." ECF No. 350 at 10; ECF No. 347 at 8. But they have not established that there was any attempt to limit Lansing's use of the lists. As Lansing contends, the CMA contains no reference to any confidentiality obligations arising from it. ECF No. 298 at 13. Nor does there appear to be another confidentiality, nondisclosure, or noncompetition agreement that could be the source of Lansing's obligation to maintain the secrecy of the lists. Nor does there appear to be any indication marked on or appended to the lists indicating their secrecy, such as a "confidential" stamp. Therefore, no evidence supports a claim that Plaintiffs attempted to keep the purported trade secret confidential; thus, **Plaintiffs' claim of misappropriation of trade secret fails.**

---

> (2) At the time of acquisition, disclosure, or use, knew or had reason to know that his or her knowledge of the trade secret was… acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use….

6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 351.03 (6th ed.).

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 43

**Accordingly, IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (ECF No. 298) is

   **GRANTED in part and DENIED in part.** Defendant's requests for summary judgment on Plaintiffs' claims of unjust enrichment, tortious interference with a business expectancy and misappropriation of trade secrets are **GRANTED**; these claims are dismissed. Defendant's request for partial summary judgment that no fiduciary duties are owed to PC and CWCP outside the CMA is **GRANTED**. Defendant's request for partial summary judgment on the issue of whether PC and CWCP can assert a claim of breach of the covenant of good faith and fair dealing is **DENIED;** that aspect is dependent upon whether or not PC and CWCP are parties to the CMA. Defendant's request for partial summary judgment on Plaintiffs' claim for alleged freight rebate damages is **DENIED**. Defendant's request for partial summary judgment on Plaintiffs' claim for partnership accounting is **DENIED**.

2. Plaintiff's Amended Motion for Summary Judgment (ECF No. 340) is

   **GRANTED in part and DENIED in part**. Plaintiffs' request for summary judgment on their claims of breach of contract are **DENIED**. The Court has determined that Lansing and PGT formed a joint venture through the CMA and fiduciary duties are owed between those two

ORDER DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT ~ 44

entities and thus, the Court **GRANTS** partial summary judgment to

Plaintiff on this issue.  There remains a genuine dispute of material fact

as to whether PC and CWCP are also parties to the CMA (joint venture),

therefore, Plaintiffs motion with respect to fiduciary duties, breach, and

damages as to them is **DENIED**. Plaintiff's motion for partial summary

judgment on the issue of breach of the duty of good faith and fair dealing

is **DENIED**.  Plaintiffs' request for an accounting is **GRANTED**.

3. Because triable issues of fact remain on the legal claims for breach of

   contract, breach of fiduciary duty, breach of the duty of good faith and

   fair dealing, as well as the equitable claim for an accounting, the Court

   hereby bifurcates the trial on the issues as follows.

     a. The Court will conduct a **bench trial for an accounting**

       commencing at the time now scheduled for the jury trial in the

       Final Amended Scheduling Order (ECF No. 206): **January 13,**

       **2014 at 9:00 a.m., in Spokane, Washington.**

     b. The remaining, unexpired deadlines and the pretrial conference set

       in the Final Amended Scheduling Order (ECF No. 206) are

       **VACATED**.

     c.  Trial briefs for the accounting shall be filed on or before **January**

       **7, 2014**. A courtesy copy of each party's exhibits shall be provided

to the Court on or before **January 7, 2014**. All motions in limine and objections relating to the accounting will be heard during the bench trial. The parties are directed to appear with witnesses and exhibits required to provide a complete accounting of the relationship between Lansing and PGT under the CMA.

d.  Lansing has the burden of proof of the account's accuracy and shall present its case first.  *See In re Tembreull' Estate*, 37 Wash.2d 93 (1950)) ("When a managing partner who keeps the books is [sued] for settlement, he must sustain the burden of proof of the correctness of the account…").

e.  All remaining claims will be tried in a **jury trial at a date to be determined,** after consultation with the parties.

The District Court Executive is hereby directed to enter this Order and provide copies to counsel.

**DATED** December 20, 2013.

THOMAS O. RICE
United States District Judge